Joseph **LAMONT**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

81 Civ. 6627 (KTD).

United States District Court,
S.D. New York.

June 3, 1985.

Paul C. Matthews, New York City, for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Janis G. Schulmeisters, Atty. in Charge, Torts Branch, Civ. Div., U.S. Dept. of Justice, New York City, for defendant; Paul M. Wasserman, New York City, of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge.

The sea has fascinated man for ages. Sailors have been simultaneously held in pity and in awe. Even the law for centuries has held seamen to be wards of the court and special provision has been made in admiralty for those who go down to the sea in ships. Recent statutes designed primarily for landlubbers have not excluded seamen from their sweep and, at times, seeming contradictions appear between such statutes and the law of the sea. Collective bargaining agreements covering seamen have been written using landlubber's terms and concepts and have produced similar anomalies. This is such a case.

The facts underlying the issues are not in dispute. The principal substantive issue is purely a question of law: is "overtime" normally paid to a healthy seaman to be included in calculating the benefits due to a seaman who becomes ill or is injured while in the service of a ship? Both sides have moved for judgment and have stipulated to the following facts.

On September 2, 1980, in Orange, Texas, the USNS SEALIFT ATLANTIC ("Atlantic"), a public vessel of the United States, commenced a voyage under foreign articles. The voyage terminated on August 18, 1981 in Corpus Christi, Texas. The

Atlantic was chartered to the Department of the Navy, Military Sealift Command, and was operated and managed by Marine Transport Lines, Inc. ("MTL").

Mr. Lamont began employment with defendant as an unlicensed seaman aboard the Atlantic in the capacity of a Qualified Member of the Engineering Department ("QMED") at a base wage of $1,516.92 per month plus overtime and other benefits as provided for in the collective bargaining agreement between MTL and the National Maritime Union ("NMU"). Pursuant to the collective bargaining agreement, on December 16, 1980, a cost of living increase went into effect raising plaintiff's base wage to $1,557.42 per month. The vacation pay benefit was increased from $253.33 per month to $260.09 per month, and the overtime rate was increased from $13.13 per hour to $14.49 per hour.

On September 12, 1980, plaintiff signed off the ship's articles at Houston, Texas after receiving a "not fit for duty" slip from the local United States Public Health Service Hospital for a recurrence of a back condition that was the result of an injury sustained while aboard another vessel. Plaintiff remained on "not fit for duty" status until April 20, 1981. From September 13, 1980 to April 19, 1981, plaintiff was paid by MTL maintenance and cure benefits totalling $1,760.00 and unearned gross wages totalling $11,241.39. Maintenance and cure were paid at a rate of $8.00 per day and unearned wages were paid at the full base pay rate prorated for each day plaintiff was not fit for duty. During the same period, $6,261.74 was paid by MTL to the NMU Pension Fund.

On April 20, 1981, after being declared fit for duty, Lamont attempted to obtain employment aboard the Atlantic by requesting permission from MTL. The request was denied. On April 24, 1981, plaintiff registered with the NMU hiring hall in New York and obtained employment aboard the USNS EXPLORER commencing June 22, 1981. From September 13, 1980 to April 19, 1981, plaintiff was paid by MTL, maintenance, wages, and cure total-ling $11,241.39. No overtime wages, however, were paid for this period. MTL also made payments totalling $6,261.74 to the NMU Pension Fund on the plaintiff's behalf for pension and vacation benefits.

Plaintiff seeks base pay, overtime, and vacation pay from April 20, 1981 through June 21, 1981, plus overtime for the period of time that he received base wages (September 13, 1980 through April 19, 1981), plus attorney's fees. Thus, Lamont seeks to receive unearned wages for the time until he was declared fit for duty *and* able to find new employment and overtime compensation for that same period of time.

█ It is well established that a shipowner has a duty to provide maintenance, wages, and cure to a "seaman who becomes ill or is injured while in the service of the ship." *Vella v. Ford Motor Co.*, 421 U.S. 1, 3, 95 S.Ct. 1381, 1382, 43 L.Ed.2d 682 (1975); *see Griffin v. Oceanic Contractors, Inc.*, 664 F.2d 36, 39 (5th Cir. 1981). The shipowner's duty derives from the hazardous nature of the seaman's work and is intended to encourage marine commerce. 421 U.S. at 3–4, 95 S.Ct. at 1382–1383. The responsibility for these benefits springs from the relationship of ship and seaman and not from the employment contract. *See Isthmian Lines, Inc. v. Haire*, 334 F.2d 521, 523 (5th Cir.1964). Furthermore, the right of the seaman to unearned wages continues either through the end of the voyage (or the end of the contractual period of employment) or until the seaman becomes fit for duty, whichever occurs first. *See Griffin*, 664 F.2d at 39; *Vickers v. Tumey*, 290 F.2d 426, 434 (5th Cir.1961).

## I.

### THE PROCEDURAL QUESTION

Citing *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) and *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), defendant argues that plaintiff is barred from any recovery because he has failed to exhaust his remedies under the NMU collective bargaining agreement. I disagree.

It has been held previously that a seaman is not procedurally barred from pursuing judicially his statutory right to the prompt payment of earned wages by a failure to utilize his collective bargaining agreement grievance procedure machinery. *See Arguelles v. U.S. Bulk Carriers, Inc.*, 408 F.2d 1065, 1071–72 (4th Cir.1969), *aff'd*, 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971). The Fourth Circuit reasoned that because Arguelles was "seeking the judicial adjudication or enforcement of his rights created by a federal statute which applies solely to seamen and the payment of their wages," he did not have to use the "additional mode of redress for such seaman and which he may pursue, at his election." 408 F.2d at 1071. Affirming the decision of the Fourth Circuit, the Supreme Court stated that it could "find no suggestion in the legislative history of the Labor Management Relations Act of 1947 that grievance procedures and arbitration were to take the place of the old shipping commissioners or to assume part or all of the roles served by the federal courts protective of the rights of seamen since 1790." 400 U.S. at 356, 91 S.Ct. at 412. Although the Fourth Circuit and the Supreme Court limited its decision to a seaman's claims for personal earned wages, *see* 400 U.S. at 357, 91 S.Ct. at 412, I find that the reasoning employed by those courts is similarly applicable to the instant case involving Lamont's claim for unearned wages.

■ Maintenance, wages, and cure derive from the relationship between the ship and seaman. The seaman is entitled to these benefits even if there is no provision for such in the collective bargaining agreement. *See Ladzinski v. Sperling Steamship & Trading Corp.*, 300 F.Supp. 947, 949 (S.D.N.Y.1969). The court in *Ladzinski* stated that:

> [t]he duty to provide maintenance and cure and unearned wages is ... regarded as one implied and imposed by law; they are not "wages" in the same sense as wages which have been expressly agreed upon in consideration of services rendered. Even if the contract between the

seaman and the shipowner makes no provision for maintenance and cure and unearned wages, they are recoverable under the general maritime law.

300 F.Supp. at 359.

The case of *Korinis v. Sealand Services, Inc.*, 490 F.Supp. 418 (S.D.N.Y.1980), cited by defendant in support of its exhaustion defense, is unpersuasive. In *Korinis*, the court, reasoning that the seaman's claims for transportation expenses and unearned wages were not claims for compensation for services rendered covered by 46 U.S.C. § 596, dismissed the claims because Korinis had not exhausted the procedures required by the collective bargaining agreement. *Id.* at 420. I do not see any basis for a distinction between a seaman's right to earned wages and a seaman's right to unearned wages insofar as the requirement to exhaust collective bargaining remedies is concerned. Nor does the court in *Korinis* suggest a basis for such a distinction. The right to unearned wages is "ancient", and, as already stated, derives from the relationship between the ship and the seaman. It does not derive from the collective bargaining agreement. In this case, the collective bargaining agreement contains an arbitration provision and a grievance machinery provision. It does not address the issue of unearned wages though it does provide for maintenance at a rate of $8.00 per day.

■ In addition, one of the considerations underlying the exhaustion doctrine in the labor relations field is that the arbitrator would have greater expertise than a court in resolving disputes between employers and employees. In a maritime context such as this, however, federal courts have had some 180 years of experience in "protecting the rights of seamen and are not without knowledge in the area." 400 U.S. at 356, 91 S.Ct. at 412.

■ Furthermore, the courts in *Arguelles*, in holding that no exhaustion requirement existed with respect to claims for earned wages, relied principally on the fact that the statute providing for the prompt payment of such wages predated the labor relations statute. Certainly then,

the same reasoning should apply here. The right of a seaman to seek in federal court unearned wages, maintenance, and cure also predated all of the relevant labor relations statutes and, indeed, the relatively new method of resolving disputes through collective bargaining and arbitration.[1] Thus, it is logical to permit the seaman to elect whether to pursue his claim through the bargaining agreement machinery. Such machinery should not be considered a mandatory substitute for the seaman's right, grounded in ancient maritime law, to the prompt payment of wages. *See Arguelles,* 408 F.2d at 1071–72.

## II.

## THE QUESTIONS OF RECOVERY

### A. *Coverage*

A minor question first arises as to whether Lamont may recover unearned wages for the April 20 through June 21 period. For the following reasons, I conclude that he may. The voyage terminated on August 18, 1981 but Lamont was declared fit for duty before that date. The parties have stipulated that on April 20, 1981, immediately after being declared fit for duty, Lamont unsuccessfully attempted to rejoin the Atlantic. On April 24, 1981, plaintiff registered with the union hiring hall in New York to obtain employment aboard another vessel. He obtained employment aboard the USNS EXPLORER commencing June 22, 1981. Thus, it is undisputed that as soon as plaintiff was declared fit for duty, he sought new employment.

The court in *Warren v. United States,* 75 F.Supp. 836 (D.Mass.1948), faced with a similar question, held that the seaman's contract assures him of "protection during the period of actual illness and the subsequent period of looking for a suitable job...." *Id.* at 838. *See generally* M. Norris, The Law of Seaman § 544, at 18 (3d ed. 1970). The court in *Warren* stated:

> The reason is that the seaman ought not to be left in the lurch during the period of time that he has been assured a job. This is important in all kinds of employment where the employee has a promise of a job for a fixed period. It is particularly important for a seaman who may be stranded in a foreign port. And it is consistent with the rationale of the contract that the seaman's right may extend beyond the point when he is completely well.

*Id. Cf. Griffin v. Oceanic Contractors, Inc.,* 664 F.2d at 39 (Griffin could only recover wages until he recovered because defendant held his position open for him; thus, the court did not reach the issue of whether a seaman must be both fit for duty and able to find suitable employment).[2] The same logic which dictates that an injured seaman be awarded wages until he is declared fit for duty mandates that he be awarded wages until he has obtained new employment, provided, of course, that he makes a good faith effort to obtain employment after his recovery. Thus, I find that Lamont is entitled to wages from April 20, 1981 through June 21, 1981.

### B. *"Overtime"*

Defendant contests plaintiff's demand that "overtime" be included in the compu-

---

**1.** A seaman's right to maintenance, wages, and cure, however, is distinguishable from other rights enjoyed by a seaman. For example, a seaman's claim of an employer's discriminatory conduct arising out of a disciplinary action or a claim of unfair discharge would be proper subjects for arbitration or a grievance and the national labor relations policy underlying the labor laws would clearly be undermined if the seaman were not required to utilize the procedures agreed to by the union and management. *See, e.g., Freedman v. National Maritime Union,* 347 F.2d 167 (2d Cir.1965), *cert. denied,* 383 U.S. 917, 86 S.Ct. 910, 15 L.Ed.2d 671 (1966); *Brandt*

*v. United States Lines,* 246 F.Supp. 982 (S.D.N.Y. 1964).

**2.** The cases cited by defendant are not inapposite. The Fifth Circuit in *Griffin* did not reach the issue of whether the plaintiff had to be declared fit for duty *and* able to find suitable employment because Griffin obtained new employment two days after being declared fit. 664 F.2d at 39 n. 2. Nor was the question squarely presented to the court in *Martinez v. Star Fish and Oyster Co., Inc.,* 386 F.Supp. 560, 565 (S.D. Ala.1974).

tation of his unearned wages. The parties have stipulated that average "overtime" earnings for a seaman such as plaintiff aboard the Atlantic was 91.33 percent of base wages, or $1,385.41 per month from September 2, 1980 to December 15, 1980 and $1,422.40 per month from December 16, 1980 to the voyage's conclusion. *See* Stipulation of Facts, ¶ 11. Thus, much of the total income earned by a seaman on the Atlantic was "overtime" compensation. In light of the apparent custom and practice in this case of the seamen working a substantial amount of "overtime," I conclude that Lamont is entitled to recover, in full, the compensation that he would have earned but for his illness or injury as such an assessment can be made without speculation. *Cf. Burke v. Mathiasen's Tanker Industries, Inc.*, 393 F.Supp. 790, 794 (E.D. Pa.1975) (held that seaman was not entitled to extra days pay for months containing 31 days where it was customary to pay seamen on a monthly basis); *Robinson v. Pocahontas, Inc.*, 477 F.2d 1048, 1050 (1st Cir.1973) (plaintiff was entitled to payment through end of fishing season).

In ancient times the free men working on the galleys (generally the officers) would share in the fortunes of the ship. If the ship were lost they would receive little or nothing for their work. If the market turned against the shipowner, again their pay would reflect that fact. And, if the voyage were successful, the free men would share in the profits. Under English law in the days of wooden ships, the sailor received not only his pay but a portion of any prize money earned by the ship.

The whaling vessels sailing from our own New England ports paid the sailors not only wages, but a portion above that where the voyage was a success. These monies became part of the expectation of the sailor when signing articles. And the

payment of unearned wages to an ill or injured seaman includes the full amount reasonably expected by the parties to be paid during the voyage.

In modern days this reasonable expectation includes "overtime." The normal work day on board ship is not the "9 to 5 existence" of the land-locked employee. The life of the seamen is dependent on his ship and the welfare of the ship is dependent on the seaman. What chaos would result if the order "All hands to duty stations" were considered merely an invitation to work "overtime." The expectation of "overtime" amounting to almost 100 percent of the base rate has led the parties to the major collective bargaining contracts covering American seamen to provide that generally sailors will be aboard ship only six months out of each year. This is done because it is the common expectation of the parties that the seaman will be able to earn the annual base income when "overtime" is included in the six months pay. I must conclude therefore that the unearned wages due to a seaman who becomes ill or injured aboard ship includes the "overtime" pay reasonably expected by the parties to be paid during the voyage. Defendant has cited no definitive case law and has presented no compelling arguments why "overtime" wages should be excluded here.[3] Thus, plaintiff may recover "overtime" earnings for the period from September 13, 1980 through April 19, 1981.

Accordingly, plaintiff's motion for summary judgment is granted and defendant's motion is denied. Plaintiff is directed to submit a judgment on notice for $17,070.55. Plaintiff's application for attorney's fees, is granted. Written application, including detailed records is to be submitted within 14 days of the date hereof.

SO ORDERED.

---

**3.** The authority cited by the defendant does not squarely address the issue of whether an injured seaman is entitled to "overtime" as part of his unearned wages, *see, e.g., Martinez v. Star Fish and Oyster Co., Inc.*, 386 F.Supp. 560, 564 (S.D. Ala.1974); M. Norris, The Law of Seamen § 544 at 16 n. 17 (3d ed. 1970). Moreover, in *Gajew-* *ski v. United States*, 540 F.Supp. 381, 386 (S.D.N.Y.1982), I held merely that the plaintiff could not contend, on the one hand, that "overtime" violated the Jones Act and, on the other hand, claim "overtime" as due and owing under his wage claim. This case is distinguishable.